# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Idil Abdull,

        Plaintiff,

            v.

Lovaas Institute for Early
Intervention Midwest,

        Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-2152 ADM/JJK

_____

Michael A. Fondungallah, Esq., Fondungallah & Kigham, LLC, St. Paul, MN, on behalf of
Plaintiff.

John M. Mulligan, Esq., Mulligan & Bjornnes, PLLP, Minneapolis, MN, on behalf of Defendant.
_____

## I.  INTRODUCTION

On October 14, 2014, the undersigned United States District Judge heard oral argument

on Defendant Lovaas Institute for the Early Intervention Midwest's ("Lovaas") Motion for

Summary Judgment [Docket No. 33] and on Plaintiff's Motion to Strike the Affidavits of Dr.

Eric Larsson and John Mulligan [Docket No. 52] submitted in support of Defendant's Reply

Memorandum [Docket No. 47].  Plaintiff Idil Abdull ("Abdull") alleges Lovaas discriminated

against her and her son on the basis of race and national origin.

For the reasons set forth below, Defendant's Motion for Summary Judgment is granted

and Plaintiff's Motion to Strike the Affidavits of Dr. Eric Larsson and John Mulligan is denied

as moot.

## II. BACKGROUND

Abdull is a Somali-American whose son, A.A., was diagnosed with an autistic disorder. Abdull Aff. [Docket No. 42] ¶ 1.  A.A. received treatment for his autism through Lovaas for 21 months, from May 2008 to February 2010.  Larsson Aff. [Docket No. 36] ¶¶ 24, 57.

Abdull alleges that Lovaas discriminated against both her and her son on the basis of their race and national origin.  Abdull claims Lovaas prematurely discharged A.A. from the program after only six months, despite its policy that a child has two consecutive six-month periods to make sufficient progress to remain in the program.  Abdull contends Lovaas refused to treat A.A. because he was older than six years of age even though Caucasian children older than six were in the program.  Abdull also alleges discrete acts of discrimination including that (1) Lovaas failed to teach the same material to A.A. that it taught to Caucasian children; (2) Lovaas reassigned the staff working with A.A. more frequently than it did for Caucasian children; (3) Lovaas intentionally reduced the number of hours of therapy provided to A.A. during the summer of 2009; and (4) Lovaas subjected Abdull to special rules that were not applied to Caucasian parents.

### A.  The Lovaas Treatment Program

Lovaas is a Minnesota corporation that provides behavior therapy to young children with autism spectrum disorders using a method called Intensive Early Intervention Behavior Therapy ("IEIBT").  Def.'s Mem. Supp. Summ. J. [Docket No. 35] 1.  The goal of IEIBT is to modify autistic behaviors so that the child can function independently and be mainstreamed into the general school population.  Id.  The younger a child starts IEIBT, the more likely the program can reduce autistic symptoms.  Pl.'s Opp'n to Def.'s Mot. Summ. J. [Docket No. 41] 4.

IEIBT is a particularly time and labor intensive method of treatment for autism.  Def.'s Mem. Supp. Summ. J. 2.  A team of Lovaas professionals – including behavior therapists, senior behavior therapists, a clinical supervisor, and a psychologist – work together to provide appropriate, individualized treatment to each child based on the child's particular needs.  Larsson Aff. ¶¶ 8, 12.  Behavior therapists provide up to 40 hours of therapy each week to the child in the child's home.  Id. ¶ 12.  In addition, a clinical supervisor spends five to eight hours per week evaluating the child and training the parents to reinforce appropriate behaviors.  Id.

Because of the extensive time and labor associated with IEIBT, the cost of Lovaas' services is over $100,000 per year per child.  Def.'s Mem. Supp. Summ. J. 2.  The cost of services for many children in the Lovaas program, including A.A., can be covered through Medical Assistance, Minnesota's Medicaid program.  Larsson Aff. Ex. 5 [Docket No. 37].  Due to the expense, the Minnesota Department of Human Services requires a licensed psychologist to certify periodically that the services provided are "medically necessary."  Larsson Aff. ¶ 11.

To determine whether IEIBT is "medically necessary" for the child, Lovaas conducts a formal evaluation every six months to assess the child's responsiveness to treatment.  Id. ¶¶ 11, 14, 20.  As part of this process, Lovaas documents the amount of progress the child has made as a result of IEIBT to determine its effectiveness and prognosis for success in the future.  Id. ¶ 11. The child must make substantial developmental gains on testing assessments to warrant continuation of IEIBT over other available autistic treatment services.  Id. Ex. 8.  Because Lovaas re-evaluates the child every six months, Lovaas only agrees to provide one six-month term of treatment at a time.  Id. ¶ 11.

**B. Lovaas Policies Regarding Recommendations of Continued IEIBT**

Lovaas requires parents with a child in the program to sign a comprehensive Informed

Consent for Direct Treatment Services for Intensive Early Intervention Behavior Therapy

("Informed Consent") before beginning services and before each subsequent six-month term of

treatment.  Id. ¶¶ 13, 15.  Both the clinical supervisor and the psychologist spend several hours

reviewing the Informed Consent with the parent every six months to make sure the parent

understands its implications.  Id. ¶ 15.  The Informed Consent explains Lovaas' policies

regarding the six-month review:

> A progress review will occur after the first six months to determine whether the
> intensive treatment model is appropriate for the child. This determination will be
> based upon an objective measurement of the child's rate of progress.  If the
> treatment is considered appropriate, the program will continue, with a review
> every six months, until the Institute and the parents agree not to initiate another
> six-month service agreement. If the result of a six-month review is that either the
> parents or the Institute conclude that the treatment is no longer appropriate, a
> transition plan will be developed and implemented for a smooth transition into
> more suitable services . . .
>
> If a child fails to make sufficient progress in mastering benchmark objectives in
> two consecutive six-month periods, then a transitional plan will be developed and
> implemented during the subsequent six-month period review.

Id. Ex. 7 ¶¶ 15, 16.

The Lovaas Institute Policy and Procedures Manual ("Policy and Procedures Manual")

addresses the criteria that define "progress" for the purpose of recommending continued IEIBT.

Id. Ex. 8 at 17.  To continue IEIBT after the first six-month progress review, the child must have

passed the Early Learning Measure.  Id.  To continue IEIBT after subsequent six-month progress

reviews, the child must pass 80% of skill acquisition benchmarks.  Id.  If the child fails to make

sufficient progress in two consecutive six-month periods, the child's therapy will transition to a

focus on functional goals aimed toward improving the child's independence and quality of life.

Id.

The Policy and Procedures Manual also contains a section addressing how the age of the

child influences the duration of treatment.  It states:

> In no case is the child's age taken into account as the primary factor in making the
> decision to continue treatment.  While it may be that the child has stopped making
> the therapeutic process that would justify [Lovaas's] services, as the child did
> grow older; it is the lack of progress, or the change in the parent's goals, that
> causes the termination, rather than the child's age alone.   In many cases, [Lovaas]
> has continued to serve older children; out of [Lovaa's] commitment to the child,
> whenever the child could benefit.  However, many older children no longer make
> sufficient progress to justify the extreme cost of an intensive therapy program,
> when typical special programs, which can be just as effective, already exist in the
> child's community.

Id.

## C.  Lovaas' Provision of Services to A.A.

### 1.  A.A.'s First Seven Months in the Program

A.A. was diagnosed with autism in 2007.  Larsson Aff. Ex. 1-2.  A.A. applied to Lovaas

and began receiving IEIBT in May 2008.  Larsson Aff. ¶ 24.  At the time, he was five years and

nine months old and nonverbal.  Id.  In the initial assessment, Lovaas did not project the best

prognosis, i.e. recovery from autism, for A.A.  Id.  Abdull signed the Informed Consent before

Lovaas began treating A.A.  Id. ¶ 16.

Amy Novotny was A.A.'s clinical supervisor.  Id. ¶¶ 25, 69.  Novotny worked with A.A.

for three months, until she left Lovaas for another organization.  Id.  Victoria Crow temporarily

served as A.A.'s interim clinical supervisor for a few weeks before Karin Morris was assigned as

A.A.'s permanent clinical supervisor.  Id. ¶ 70.  Abdull asked Crow to remain as A.A.'s

supervisor, but she was reassigned to another family.  Abdull Aff. ¶ 12.  Crow allegedly told

Abdull that she generally does not work with older children such as A.A., yet she was reassigned to work with a family who had older children.  Id.

　During scheduled therapy hours, Abdull frequently complained to the behavior therapists and instructed them not to comply with A.A.'s recommended treatment program.  Larsson Aff. ¶¶ 28-29.  Lovaas does not authorize behavior therapists to address parent complaints but requires them to refer the complaints to their supervisor.  Id. ¶ 34.  In response to the frequency of Abdull's complaints, Lovaas implemented a daily parent communication system, instead of its normal weekly system, so that the proper Lovaas staff member could address Abdull's disagreements.  Id. ¶¶ 34-37.

IEIBT requires a substantial time commitment on the part of the parent.  Against the advice of Lovaas, Abdull interrupted A.A.'s treatment by cancelling a large number of therapy sessions.  Id. ¶ 27.  Abdull cancelled 40 parent training programs (16% of 254) and a total of 327 scheduled treatment hours of all types.  Id.

## 2. A.A.'s Six Month Progress Review

　After A.A. had received IEIBT through Lovaas for seven months, A.A.'s clinical supervisor Karin Morris conducted A.A.'s first six-month progress review on December 18, 2008.  Id. ¶ 34.  The review showed A.A. made only minor progress.  A.A. had mastered only one of four benchmarks and one of four Early Learning Measure Tests.  Id. ¶ 35.  In addition, he engaged in a very high frequency of repetitive behaviors that had not responded to treatment.  Id. His developmental gains were only 1.8 months in 6 months' time.  Id.  Based on A.A.'s amount of progress within the first six months, Lovaas determined that A.A. was unlikely to recover from autism with IEIBT and reviewed this prognosis with Abdull.  Id. ¶ 40.  Lovaas told Abdull

that it would provide an additional six months of IEIBT to A.A., which would be followed by an additional six months of services focused on a transition to alternative services.  Id. ¶ 41.

Abdull avers that Lovaas decided at the initial six month review that A.A. was too old for the program and had to be discharged.  Abdull Aff. ¶ 15.  Abdull expressed concern that Lovaas had unfairly projected that A.A. would not recover after only the first six-month review when the Informed Consent states that children will receive two consecutive six-month periods of therapy to show significant process toward recovery.  Larsson Aff. ¶ 38.  According to Lovaas, staff members explained to her that Lovaas was not making a decision to discharge A.A. at this juncture.  Id. ¶ 40.  Rather, they were informing her that, based on the results of therapy after seven months, A.A. would, in all likelihood, not make the amount of progress required under the Medical Assistance program to justify a continuation of IEIBT services beyond *twelve* months of treatment.  Id.  If, however, A.A.'s recovery-oriented skills did accelerate at the end of twelve months of IEIBT treatment, Lovaas would recommend continued IEIBT treatment.  Id. ¶ 46.

### 3.  Abdull's Requests to Replace Staff

After the six-month review, Abdull requested that Lovaas replace Morris as A.A.'s clinical supervisor.  Id. ¶¶ 46-47.  Lovaas informed Abdull that it did not have another clinical supervisor available, and as a result A.A. would have to be discharged.  Id. ¶ 47.  One of Lovaas' clinical directors, Charryse Fouquette ("Fouquette"), volunteered to act as A.A.'s clinical supervisor despite the need to make a special accommodation to her workload.  Id. ¶ 53.  During A.A.'s time in the program, Abdull also requested, and Lovaas honored, two transfers of senior behavior therapists based on her personal preference.  Id. ¶¶ 73-74.

**4.   Documentation for Absences**

Due to Abdull's high frequency of cancelling parent training appointments, Lovaas set a

limit of five missed appointments before it would accelerate A.A.'s discharge from the program.

Id. ¶ 78.  Lovaas had implemented similar policies with 14 other families, the majority of which

were Caucasian.  Id.  At Abdull's request, Lovaas agreed to excuse cancelled appointments if

Abdull submitted a doctor's note for the absence.  Id. ¶ 79.

**5.   A.A.'s Subsequent Evaluations and Treatment**

A.A.'s outside psychologist, Mary Zielinski, evaluated A.A. in April 2009 and sent

Lovaas a letter on May 1, 2009, which stated:

> I have seen significant improvement in [A.A.] since last assessed a year ago.
> With that said, [A.A.] continues to have significant impairment with social
> interaction and communication, consistent with the disorder. Given the progress
> seen in [A.A.] using the [IEIBT] approach, I would recommend continued
> services.

Id. Ex. 15.

Lovaas did not alter A.A.'s treatment plan as a result of the letter.  Pl. Mem. Opp. Summ. J. 8.

On June 3, 2009, Lovaas conducted A.A.'s second six-month review.  Larsson Aff. ¶ 54.

At this review A.A.'s developmental gains were 1.4 months in 6 months.  Id.  He had mastered

six of seven benchmarks geared toward long-term services but did not accelerate mastery of

recovery-oriented skills.  Id.  Lovaas recommended therapy focused on long-term transitional

goals rather than goals aimed toward recovery so that the family would be able to live the

highest quality life with the most independence.  Id.

During the summer of 2009, A.A. received fewer hours of therapy.  Id. ¶¶ 75-76.  Two

Lovaas behavior therapists resigned, and Abdull declined to have trainees in her home despite

agreeing to the provision of home services by trainees in the Informed Consent agreement.  Id. ¶ 76.  Despite the reduction in hours, A.A. still received an average of 46 hours of therapy per week during the six-month interval from June to December 2009, above the average number of hours for children in the program at the time.  Id.; Larsson Aff. Ex. 24.

On December 30, 2009, Lovaas conducted its third six-month review.  Larsson Aff. ¶ 56. A.A.'s developmental gains were only 0.3 months in 7.6 months' time.  Id.  For this review period, Lovaas focused on the skills Abdull requested, but A.A. was unable to make significant progress in those areas.  Id.  Lovaas recommended another six-month term of services, which would have been a total of 24 months in the program.  Id. ¶ 57.  Zielinski again evaluated A.A. and found that A.A.'s scores fell in the low range of functioning for most areas assessed. Larsson Aff. Ex. 16.  In February 2010, after 21 months with Lovaas, Abdull transferred A.A. from Lovaas to a long-term care organization.  Id.

**D.  Abdull's Complaints to Administrative Agencies**

During A.A.'s time in the Lovaas program, Abdull complained about receiving discriminatory treatment on multiple occasions.  Id. ¶ 58.  In response, Lovaas reviewed its policies each time and determined that it was not acting in a discriminatory manner.  Id.  Lovaas rewrote objectives and mastery criteria for A.A. according to Abdull's preferences.  Id.  For example, it rewrote a benchmark requiring A.A. to learn to eat with utensils because Abdull indicated that mastering that skill was not culturally appropriate.  Id.

Abdull contacted the Minnesota Ombudsman's Office, ARC Greater Twin Cities, the Minnesota Disability Law Center, and the Minnesota Board of Psychology about the alleged

discriminatory treatment by Lovaas.  Id. ¶¶ 59-63.  No agency determined that Lovaas engaged

in discriminatory practices toward A.A. and Abdull.  Id.

## III. DISCUSSION

### A.  Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall

be rendered if there exists no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.

The United States Supreme Court, in construing Federal Rule 56(c), stated in Celotex

Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element
> essential to that party's case, and on which that party will bear the burden of proof
> at trial.

On a motion for summary judgment, the court views the evidence in the light most

favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

However, the nonmoving party may not "rest on mere allegations or denials, but must

demonstrate on the record the existence of specific facts which create a genuine issue for trial."

Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

If the nonmoving party presents evidence sufficient to permit a reasonable jury to return a

verdict in its favor, summary judgment is inappropriate.  Id.  However, "the mere existence of

some alleged factual dispute between the parties is not sufficient by itself to deny summary

judgment. . . .  Instead, 'the dispute must be outcome determinative under prevailing law.'"  Get

Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992)(citation omitted).  Moreover, a

plaintiff facing a summary judgment motion cannot "get to a jury without any significant probative evidence tending to support the complaint." Rath v. Selection Research, Inc., 978 F.2d 1087, 1091 (8th Cir. 1992), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242. In addition, "summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." Krenik, 47 F.3d at 959.

**B.  Count 1: National Origin and Race Discrimination in Violation of 42 U.S.C. §2000a**

      **1.  Plaintiff failed to establish a *prima facie* case for discrimination**

42 U.S.C. §2000a prohibits discrimination on the grounds of race, color, religion, or national origin in places of public accommodation. In order to establish a *prima facie* case for discrimination under 42 U.S.C. §2000a, plaintiff must show that she (1) is a member of a protected group; (2) was similarly situated by circumstance to other individuals outside that group; and (3) was treated more harshly or disparately than similarly situated non-group members. O'Neal v. Moore, 2008 U.S. Dist. LEXIS 99641, 2008 WL 5068947, at *24 (D. Minn. Aug. 22, 2008), aff'd, 355 F. App'x 975 (8th Cir. 2009).

Lovaas is entitled to summary judgment on this claim because Abdull fails to provide evidence that either she or A.A. were treated less favorably than similarly situated families who are not Somali-American. Abdull lacks evidence that the Caucasian families referenced in her affidavit are similarly situated. Much of the "proof" supporting this claim is hearsay or speculative statements regarding the treatment received by Caucasian families. See, e.g., Abdull Aff. ¶¶ 21-22, 25, 27. These statements are not based on first-hand knowledge and are therefore disregarded on a motion for summary judgment. Blunt v. Lower Merion Sch. Dist., 826 F. Supp.

2d 749, 762 (E.D. Pa. 2011).

The only "similarly situated" evidence that arguably can be considered is a <u>Minneapolis Star Tribune</u> article which states that Lovaas provided 56 hours of therapy a week to an eight-year-old boy, records showing Morris treated another child from age four through eight, and the deposition testimony of Sheri Radoux, whose children received therapy through Lovaas.  Abdull Aff. Exs. B, Q, R.  This evidence, whether considered either individually or together, does not establish the third element of a race discrimination claim under § 2000a.  To support her claim that Lovaas treated Caucasian children older than six but would not treat A.A. after he reached age six, Abdull relies on the <u>Minneapolis Star Tribune</u> article featuring an eight year old being treated by Lovaas and the fact that Morris treated a boy until he was eight.  The mere fact that Lovaas treated two Caucasian eight year olds, whereas A.A. was set to be discharged at an earlier age, is not sufficient evidence of discrimination based on race or national origin.  This is especially true in light of Lovaas' comprehensive evidence that each child's treatment plan is individually tailored to the child's particular diagnostic assessment, progress, and goals.

Abdull offers the deposition of Sheri Radoux to show that Lovaas treated Caucasian children for longer periods of time, even though these children showed a lack of progress.  Radoux's testimony is insufficient to show that the other children referenced in the deposition were similarly situated to A.A. or that A.A. received sub-standard treatment in comparison.  Specifically, the testimony does not address the Radoux children's psychological assessments on the Lovaas metrics or rate of progress as evaluated by a medical expert.

Additionally, Lovaas taught the Radoux children different skills than A.A.  <u>Id</u>. Ex. R.  A

comparison is difficult in light of Abdull's requests to alter the skills A.A. was learning, such as not requiring A.A. to learn to eat with utensils. Abdull cannot effectively argue as an instance of discrimination that Lovaas taught a Radoux child to eat with utensils, when Abdull herself requested Lovaas not to teach A.A. this skill. In the absence of granular evidence on these issues, it is not possible to compare, much less conclude, that any difference in the treatment that A.A. received was based upon race or national origin. Abdull's vague allegations of similarity do not suffice for actual proof.

Abdull also asserts that Lovaas reassigned A.A.'s staff more frequently than it did for other families. While the facts may support more frequent changes, there is no evidence that the staff changes were in any way the product of racial discrimination by Lovaas. On the contrary, Abdull herself requested these staff changes, and did so more frequently than most other parents. Larsson Aff. ¶ 76. It is axiomatic that a self-inflicted divergence from the typical turnover in staffing is an insufficient basis to claim the motivation was racial discrimination. Abdull also alleges that Lovaas would hire additional staff if needed to fulfill a Caucasian parent's requested staff change (Abdull Aff. ¶ 15), but she offers no evidence to support this assertion.

Abdull further claims that Lovaas intentionally reduced the number of hours of therapy A.A. was to receive. The amount of hours provided to A.A. in the summer of 2009 was 46 hours per week, which is above the average number of hours per week for all groups of children during this time. Further, Abdull could have received more hours had she allowed trainees to provide services as stipulated in the Informed Consent. Id. ¶ 76; Id. Ex. 24. Again, these allegations are insufficient to support Abdull's claim of discrimination based on race or national origin.

13

Lastly, there is no evidence that the "special rules" that Lovaas required Abdull to follow resulted from race discrimination. The evidence shows that Lovaas established boundaries and guidelines for Abdull not because of her race, but rather in response to Abdull's numerous cancellations and interruptions to A.A.'s therapy. Larsson Aff. ¶¶ 26-33. Furthermore, Lovaas implemented the same steps and procedures with fourteen other families, the majority of which were Caucasian, where parent compliance with the program was identified as a concern effecting the success of a child's treatment. Id. ¶ 78.

In sum, Abdull has failed to meet her burden of proof to support a claim of race or national origin under this statute.

### 2. Section 2000a does not provide for the relief that Abdull seeks

In addition to failing to establish a *prima facie* case for discrimination, Abdull does not seek a proper remedy under 42 U.S.C. § 2000a. That statute authorizes only *preventive* relief such as injunctions or restraining orders. It does not provide for money damages. Newman v. Piggie Park Enterprises, 390 U.S. 400, 402 (1968). Abdull requests punitive damages, attorneys' fees, and costs. Am. Compl. [Docket No. 27] ¶ 48. She does not request injunctive relief and has voluntarily removed Abdull from Lovaas. Abdull's failure to seek a remedy authorized by the statute is an additional, independent reason entitling Lovaas to summary judgment on this claim.

## C. Count II: National Origin and Race Discrimination in Violation of 42 U.S.C. §2000d

In her next cause of action, Abdull alleges that Lovaas violated 42 U.S.C. §2000d, which states:

No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program receiving Federal financial assistance.

To establish national origin and race discrimination under this statute, plaintiff must prove: (1) she is a member of an ethnic minority; (2) she was denied participation in a federally funded program because of her national origin; (3) she is otherwise qualified to receive the benefit she claims she was denied.  Atakpa v. Permiter OB-GYN Associates, P.C., 912 F. Supp. 1566, 1574 (N.D. Ga. 1994).  To recover compensatory damages, plaintiff must show "discriminatory intent."  Guardians Ass'n v. Civil Service Comm'n, 463 U.S. 582, 603, 607 (1983).  Plaintiff must demonstrate that the plaintiff's race, color, or national origin was the defendant's motive for the discriminatory conduct.  Thompson By & Through Buckhanon v. Bd. of Special Sch. Dist. No. 1 (Minneapolis), 144 F.3d 574, 581 (8th Cir. 1998).

 Abdull alleges that A.A. was denied participation in a federally funded program due to his national origin.  Specifically, Abdull asserts A.A. was prematurely discharged from Lovaas after only six months of treatment when he was entitled to a full year of IEIBT.  The Informed Consent states that a child may be discharged after six months of treatment.  Larsson Aff. Ex. 7.  Abdull's allegation is also belied by the undisputed factual record; A.A. was not discharged after six months.  Lovaas recommended that A.A. receive 24 months of treatment and treated him for 21 months before Abdull transferred A.A. to another program.  Larsson Aff. ¶ 57.  Twenty-four months of services is within the range of time generally recommended for children in the Lovaas program.  Id. ¶ 42.

Abdull also asserts that A.A. was qualified to receive the benefit of additional IEIBT

through Lovaas because he was "making progress."  Abdull Aff. ¶ 10, Ex. G, U, V.  To support

this assertion, Abdull cites to A.A.'s progress toward goals other than those established by

Lovaas as sufficient justification for remaining in the IEIBT program.  Id.  Lovaas counters that,

although A.A. made some progress with their therapy, he did not make sufficient progress on

recovery-oriented skills to justify the cost of IEIBT.  Larsson Aff. ¶ 41.

To support her contention that A.A. was qualified for continued services through Lovaas,

Abdull relies on A.A.'s external psychologist Mary Zielinski's May 1, 2009 letter in which she

states:

> I have seen significant improvement in [A.A.] since last assessed a year ago.
> With that said, [A.A.] continues to have significant impairment with social
> interaction and communication, consistent with his disorder.  Given the progress
> seen in [A.A.] using the [IEIBT] approach, I would recommend continued
> services.

Abdull Aff. Ex. L.  Lovaas, however, interpreted Zielinski's letter as confirming its conclusions

that A.A. still had significant autistic behaviors and was best served by long-term services.

Larsson Aff. ¶ 42.  Zielinski does not offer a medical assessment showing that A.A. was making

the level of progress required by Medical Assistance to show that IEIBT was "medically

necessary" for A.A.  At best, these three sentences of Zielinski's letter suggest a possible

medical disagreement between Dr. Larsson and Dr. Zielinski.  Even in this scenario, without

more, Plaintiff has failed to show that A.A. was denied access to a federally funded service

which he was qualified to receive as a result of intentional discrimination.

**D. Count III: Public Accommodation Discrimination in Violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.11**

    **1. Abdull failed to establish a *prima facie* case for discrimination by a place of public accommodation**

Under Minn. Stat. § 363A.11, it is a discriminatory practice to deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color, creed, religion, or national origin.  The elements of a *prima facie* case are: (1) the plaintiff is member of a protected class; (2) the defendant discriminated against plaintiff regarding the availability of its facility; (3) the discrimination was because of plaintiff's membership in a protected class.  Monson v. Rochester Athletic Club, 759 N.W.2d 60, 63 (Minn. Ct. App. 2009).

The parties do not dispute that Abdull, as a Somali-American, is a member of a protected class.  As previously discussed in the context of Abdull's federal claims, Abdull fails to provide evidence that Lovaas discriminated against her family in its provision of services.  Therefore, Abdull has not established a *prima facie* case under the statute, and summary judgment for Lovaas on this claim is granted.

    **2. Lovaas is likely not a "public accommodation" under Minn. Stat. § 363A.11**

Lovaas argues that Minn. Stat. § 363A.11 does not apply to Lovaas because Lovaas is not a "public accommodation."  Whether an entity is a "public accommodation" under the MHRA depends on (1) the selectiveness of the group in admission of its members and (2) the existence of limits on the size of the membership.  Wayne v. MasterShield, Inc., 597 N.W.2d 917, 921 (Minn. Ct. App. 1999) (citing U.S. Jaycees v. McClure, 305 N.W. 2d 764, 770 (Minn. 1981)).

Entities which are very selective with respect to membership, which screen members, and which limit the size of the group's membership are not places of public accommodation under the MHRA.  Wayne, 597 N.W.2d at 921; Gold Star Taxi & Transp. Serv. v. Mall of Am. Co., 987 F. Supp. 741, 752-753 (D. Minn. 1997).

Lovaas contends it is not a public accommodation because each child treated by Lovaas must meet specific intake criteria.  The number of patients it can treat is also limited by staffing constraints.  Conversely, Abdull argues that Lovaas fits within the definition of a "public accommodation" because a large percentage of its services are paid for through public funding. The Court has serious doubts whether all corporations receiving public funding are a public accommodation, in light of the current case law.  The Court need not decide this question, however, in light of Abdull's failure to establish a *prima facie* case for discrimination.

## E.  Count IV: Aiding, Abetting, and Obstruction in Violation of the Minnesota Human Rights Act, Minn. Stat. § 636A.14

Abdull contends that Dr. Larsson, Scott Wright, Karin Morris, and other agents and employees of Lovaas acted in concert to discriminate against Abdull and A.A.  The MHRA provides that it is an "unfair discriminatory practice for a person to intentionally aid, abet, incite, compel, or coerce a person to engage in any practices" forbidden by the MHRA. Minn. Stat. § 363A.14(1).  However, an underlying discrimination claim is a prerequisite to a claim of aiding and abetting under the MHRA.  Minn. Stat. § 363A.14; McDonald v. City of St. Paul, 679 F.3d 698, 708 (8th Cir. 2012).  Because Abdull has failed to establish a *prima facie* case for the underlying claim of discrimination by a place of public accommodation under Minn. Stat. § 363A.11, summary judgment on the aiding and abetting claim is also proper.

18

**F. Plaintiff's Motion to Strike**

Abdull moved to strike the affidavits of Dr. Eric Larsson and John Mulligan submitted in tandem with Lovaas' Reply Memorandum.  Because the Court finds that summary judgment in favor of Lovaas is proper based solely on the evidence presented in Defendant's Summary Judgment Memorandum, the issue of the timeliness of the Larsson and Mulligan affidavit is moot.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Docket No. 33] is **GRANTED**.

2. Plaintiff's Motion to Strike the Affidavits of Dr. Eric Larsson and John Mulligan [Docket No. 52] is **DENIED** as moot.

   **LET JUDGMENT BE ENTERED ACCORDINGLY.**

                                                    BY THE COURT:


                                                    _____s/Ann D. Montgomery_____
                                                    ANN D. MONTGOMERY
                                                    U.S. DISTRICT JUDGE

Dated:  December 2, 2014.